# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| TAMEKA NELSON, RICHARD CREEL, and KARIM ABDULLAH, individually and on behalf of all others similarly situated, | Case No.: |
| | CLASS ACTION COMPLAINT |
| Plaintiffs, | **DEMAND FOR JURY TRIAL** |
| vs. | |
| NISSAN NORTH AMERICA, INC., a California Corporation; NISSAN MOTOR CO. LTD., a Japanese Company, | |
| Defendants. | |

## PLAINTIFFS' CLASS ACTION COMPLAINT

Michael A. Caddell
Cynthia B. Chapman
Cory S. Fein
CADDELL & CHAPMAN, P.C.
1331 Lamar, Suite 1070
Houston, TX 77010

Joseph G. Sauder
Matthew D. Schelkopf
Benjamin F. Johns
CHIMICLES & TIKELLIS LLP
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041

*Counsel for Plaintiffs*

Plaintiffs Tameka Nelson, Richard Creel and Karim Abdullah (collectively "Plaintiffs") bring this class action against Defendants Nissan North America, Inc. and Nissan Motor Company Ltd. (collectively, "Defendants" or "Nissan") on behalf of themselves and all others similarly situated.  Plaintiffs allege upon personal knowledge and belief as to their own acts, and upon information and belief (based on the investigation of their counsel) as to all other matters.

## INTRODUCTION

1.     This is a class action lawsuit brought by Plaintiffs on behalf of themselves and the classes defined below, which consist of current and former owners and lessees of certain Nissan Maxima, Altima, and Quest model year ("MY") vehicles with defective transmissions. This action arises from Defendants' failure, despite their longstanding knowledge of the problem, to disclose to Plaintiffs and other consumers that Nissan Maxima (MY 2004-06), Altima (MY 2005-06), and Quest (MY 2004-07) vehicles (collectively, the "Class vehicles") are predisposed to delayed shift patterns, excessive heat buildup, slippage, harshness, premature internal part wear, and metal debris, resulting in serious and expensive damage to, and/or catastrophic failure of the transmission within the Class vehicles (collectively, the "Transmission Problem").  Not only did Nissan actively conceal the material fact that this particular component is defectively designed (and requires costly repairs to fix),

but it did not reveal that the existence of this defect would diminish the intrinsic resale value of the vehicle.

2.      Upon information and belief, Defendants have been aware for years of the true nature and cause of the transmission problem in class vehicles.  This knowledge is evidenced by widespread complaints on the internet and elsewhere about the Transmission Problem, accounts from class members who have complained about this very issue to Defendants, and technical service bulletins issued by Defendants for the purpose of attempting to address this problem. Notwithstanding this knowledge, Defendants have intentionally withheld from, and/or misrepresented to Plaintiffs and other consumers of Class vehicles this material information.  Meanwhile, Defendants made numerous affirmative statements touting the high-quality and reliability of the Class vehicles.

3.      As a result of the Transmission Problem and defective vehicle design, Defendants have benefited from collecting funds from Nissan customers for vehicle service procedures such as unnecessary transmission replacements, computer re-programming and software updates, transmission fluid flushing and changing, and troubleshooting and diagnosing transmission complaints when in fact Nissan knew the true cause of such Transmission Problem within the Class vehicles was the defective vehicle design.

4.      Many owners and lessees of the Class vehicles have had to repair or replace their transmissions multiple times, thereby incurring costly transmission repairs and/or replacements as needed to return their vehicles to expected operating condition.

5.      The Class vehicles pose significant safety risks as a result of the Transmission Problem since this condition causes the Class vehicles' transmissions to slip and/or hesitate thereby creating a severe delay in acceleration and unpredictable vehicle acceleration response.  Furthermore, the Transmission Problem can cause the vehicle to experience a sudden and unexpected transmission failure whereby the vehicle will not accelerate and/or move under its own power.  This creates a serious safety concern to occupants of the Class vehicles, the occupants of other vehicles, and/or the public in general.

6.      The transmissions in the Class vehicles are uniformly and inherently defective in design, and prematurely fail under normal operating conditions well in advance of their expected useful life.

7.      As a result of Defendants' unfair, deceptive and/or fraudulent business practices, as set forth herein, the Class vehicles have a lower market value and are inherently worth less than they would be in the absence of the Transmission Problem.

8.      For customers with vehicles within the written warranty period, Nissan has done no more than to temporarily repair the transmissions within the Class vehicles or to replace them with other similarly defective and inherently failure-prone transmissions.  Nissan has refused to take any action to correct this concealed design defect when it manifests in Class vehicles outside the warranty period.

9.      Since the Transmission Problem typically manifests shortly outside of the warranty period for the Class vehicles – and given Defendants' knowledge of this concealed design defect and failure to disclose it – Nissan's attempt to limit the warranty with respect to the Transmission Problem is unconscionable here.

10.     As a result of Defendants' unfair, deceptive and/or fraudulent business practices, owners and/or lessees of Class vehicles, including Plaintiffs, have suffered an ascertainable loss of money and/or property and/or loss in value.

11.     Plaintiffs bring this action to redress Defendants' misconduct. It seek recovery under state consumer protection statutes, and for breach of express warranty, breach of implied warranty, and unjust enrichment.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction of this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§1332(d)(2) and

(6) because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000.00 exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states.  This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

13.    Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because Defendants transact substantial business in this district.  Defendants have advertised in this district and have received substantial revenue and profits from sales and/or leases of the Class vehicles in this district; therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.

14.    This Court has personal jurisdiction over the Defendants.  According to the Defendants' website, there are multiple Nissan dealers located in New Jersey.  Additionally, Nissan North America, Inc. maintains one of its five regional Market Representation Offices in Somerset, New Jersey.  *See* http://www.nissanusa.com/about/diversity/dealers.html.  And as set forth below, the facts relevant to Plaintiff Abdullah occurred in substantial part in New Jersey. As such, Defendants have conducted substantial business in this judicial district, and intentionally and purposefully place Class vehicles into the stream of commerce within the districts of New Jersey and throughout the United States.

## THE PARTIES

15.    Plaintiff Tameka Nelson is a resident and citizen of the State of California, residing at 1751 North Pennsylvania Street, San Bernardino, San Bernardino County, California.

16.    Plaintiff Richard Creel is a resident and citizen of the Commonwealth of Pennsylvania, residing at 1318 Ridgewood Dr., Allison Park, Allegheny County, Pennsylvania.

17.    Plaintiff Karim Abdullah is currently a resident and citizen of the State of Maryland, residing at 3523 Piney Woods Place, Laurel, Prince George's County, Maryland.  As set forth below, Abdullah is a former resident of New Jersey, and all facts relevant to him occurred in New Jersey.

18.    Defendant Nissan North America, Inc. ("NNA") is a California corporation which is qualified to do, and does, business in the State of California and in this judicial district.  Upon information and belief, Defendant NNA can be served through its registered agent for service in California at CSC, 2730 Gateway Oaks Dr. in the city of Sacramento.  Upon information and belief, NNA's domestic headquarters is located at One Nissan Way Franklin, Tennessee, 37067.

19.    Defendant Nissan Motor Company Ltd. ("NMC") is a Japanese company which does business in this State and judicial district.   Upon

information and belief, NMC's place of business is located at: 17-1 Ginza 6-Chome Chuo Ku Tokyo 104, Japan.

20.     Upon information and belief, Defendant NNA communicates with Defendant NMC concerning virtually all aspects of the Nissan products it distributes within the United States.

21.     Upon information and belief, the design, modification, installation and decisions regarding the 22A transmission within the Class vehicles were performed exclusively by Defendants NMC and/or NNA.

## FACTUAL ALLEGATIONS

22.     Nissan designed, manufactured, marketed, advertised, warranted, sold and leased the Class vehicles at issue in this case within this district, and throughout the United States, to members of the Classes.

23.     Plaintiffs' experience, mirroring those of thousands of other Class vehicle purchasers who have posted messages on the Internet documenting their problems with the Transmission Problem, demonstrates that Nissan's representations to Plaintiffs and Class members were false and misleading.

24.     In 1960, NMC began importing and making Datsun branded vehicles within the United States.  In 1990, NNA was created to coordinate Nissan's push to enhance the design, development, manufacturing, and marketing of Nissan vehicles in North America.  Headquartered in Franklin, Tennessee,

NNA coordinates all of Nissan's operations in the United States, Canada, and Mexico including automotive styling, consumer and corporate financing, and engineering.[1]

25.    In or around 2002, Nissan introduced the "FF-L" automobile platform, consisting of its front-wheel drive vehicle models.  The Class vehicles were built using Nissan's FF-L Platform.  Upon information and belief, these FF-L platform vehicles were built at a Nissan manufacturing facility in North America.

26.    The Class vehicles contain a transversely mounted 3.5 liter, dual overhead cam, V6 engine, also referred to as the "VQ35DE."  This engine produces approximately 265 horsepower and 255 pound-feet of torque in the Nissan Maxima (MY 2004-06), up to 260 horsepower and 251 pound-feet of torque in the Nissan Altima (MY 2005-06), and 240 horsepower and 242 pound-feet of torque in the Nissan Quest (MY 2004-07).

27.    The VQ35DE engines in the Class vehicles were mated to a 5-speed automatic transmission (built by Aisin) known as the RE5F22A ("22A").[2]  The 22A transmission is designed for use in transverse engine configurations, such as in the Class vehicles, and can reportedly handle up to 243 pound-feet of torque.

---

[1]    http://www.nissanusa.com/about/corporate-info/nissan-in-north-america.html

[2]    This particular transmission is also referred to as the "AW 55-50" within the automotive

28.     The Class vehicles 22A transmissions also rely on the use of a valve body for proper operation.  The valve body is a major component of the 22A transmission and contains a maze of channels and passages that direct hydraulic fluid to the numerous valves which, when working properly, should then activate the appropriate clutch pack or band servo within the transmission.  When properly designed, this results in a smooth shift to the appropriate gear for each driving situation.  The design and function of the 22A valve body proved to be inappropriate as it caused, in part, delayed shift patterns, excessive heat buildup, slippage, harshness, premature internal part wear, metal debris, and catastrophic transmission failure.

29.     Upon information and belief, Defendant Nissan also incorporated computer programming and/or electronic control of the 22A transmission into the Class vehicles through the use of, *inter alia*, the Transmission Control Module ("TCM").  This combination proved to be inappropriate as it caused, in part, delayed shift patterns, excessive heat buildup, slippage, harshness, premature internal part wear, metal debris, and catastrophic transmission failure.

30.     Nissan offered the VQ35DE engine and 22A transmission combination in the Class vehicles but later discontinued use of the 22A

---

community.

transmission.  Defendant continues to use the VQ35DE engine in its current production vehicles.

31.     Defendants' factory maintenance schedules for the Class vehicles did not require having the transmission fluid flushed or changed during the life of the vehicle unless it was used for towing a trailer, a camper or car–top carrier, or driving on rough or muddy roads.[3]

32.     Upon information and belief, Defendant incorporated insufficient designs and/or modifications of the 22A transmission, specifically tailored to the Class vehicles, including, but not limited to, the valve bodies, drums, torque converters, Engine Control Module ("ECM") and TCM calibration within the Class vehicles.  These modifications and designs caused, in part, delayed shift patterns, excessive heat buildup, slippage, harshness, premature internal part wear, metal debris, and catastrophic transmission failure.

33.     Upon information and belief, Nissan incorporated an inadequate design and/or inappropriate modifications of the 22A transmission within the Class vehicles causing, in part, delayed shift patterns, excessive heat buildup,

---

[3]     Upon information and belief, Nissan also offered a "Premium Maintenance" schedule to customers that included transmission fluid flushing and/or changing at certain service intervals.  However, as explained in Nissan's Service and Maintenance Guide, "Premium Maintenance is a Nissan-recommended option; however, owners need not perform such maintenance in order to maintain the warranties which come with their Nissan."

slippage, harshness, premature internal part wear, metal debris, and catastrophic transmission failure.

34.     Transmissions are designed to function for periods (and mileages) substantially in excess of those specified in Defendants' warranties, and given past experiences, consumers legitimately expect to enjoy the use of an automobile without worry that the transmission would fail for significantly longer than the limited times and mileages identified in Defendants' warranties.

35.     Upon information and belief, Nissan, through (1) their own records of customer complaints, (2) dealership repair records, (3) records from the National Highway Traffic Safety Administration (NHTSA), and other various sources,[4] were well aware of the alarming failure rate of the 22A transmissions within the Class vehicles.  Regardless, Nissan failed to notify customers of the nature and extent of the problems with the 22A transmission while also failing to provide any adequate remedy.  Despite such knowledge, Nissan continued to manufacture and market the Class vehicles with the Transmission Problem.

36.     Members of the Classes could not have discovered the latent defects within the 22A transmission through any reasonable inspection of their vehicles prior to purchase.

---

[4]   *See* http://www.consumeraffairs.com/automotive/nissan_maxima.html

37.     Nissan was under a duty to Plaintiffs and the Class to disclose the Transmission Problem within the Class vehicles because: (a) Nissan was in a superior position to know the true state of facts about the transmission; (b) Plaintiffs and Class members could not reasonably have been expected to learn or discover that the Class vehicles had a defect until manifestation of the failure; (c) Nissan knew that Plaintiffs and Class members could not reasonably have been expected to learn or discover the transmission defect; and (d) The defect caused safety problems in driving the vehicle.

38.     The existence of the Transmission Problem was within Nissan's exclusive knowledge and control, Nissan actively concealed the material defect from Plaintiffs and the Class, and Nissan's partial representations about the Class vehicles' quality – made without revealing the Transmission Problem - gave rise to a duty to disclose.

39.     Defendant expressly warranted the affected vehicles to be free from drivetrain defects for a period of 5 years or 60,000 miles.[5]

---

[5]     According to the 2005 Nissan Warranty Information Booklet, this warranty is generally transferable from the original owner to subsequent owners of Class vehicles at any time ownership is transferred, without any action required by vehicle owners.

40.     When a failure occurs after the expiration of the warranty period, Nissan charges Class members to diagnose and/or repair the Transmission Problem, when in fact, Defendant is aware of the design defect.

41.     When a failure occurs during the warranty period, Nissan does not disclose the nature of the Transmission Problem in order to avoid having to provide a no-cost repair.

42.     In addition to Nissan collecting funds related to the Transmission Problem, many Class members have paid monies to third-party repair shops for services relating to the diagnosis and/or repair the Transmission Problem.  Class members have not received reimbursement for these expenses despite Defendants' awareness of the Transmission Problem.

43.     Buyers, lessees, and other owners of the affected vehicles were without access to the information concealed by Defendant as described herein, and therefore reasonably relied on Defendants' representations and warranties regarding the quality, durability, and other material characteristics of their vehicles.  Had these buyers and lessees known of the defect and the potential danger, they would have taken steps to avoid that danger and/or would have paid less for their vehicles than the amounts they actually paid, or would not have purchased the vehicles.

44.     Nissan's deceptive marketing and sales practices, including affirmative misrepresentations and omissions, were material and substantial and were made in the form of common misrepresentations of material facts upon which persons, including Plaintiffs and Class members could be expected to, and did, rely.

45.     As alleged in this Complaint, Nissan's advertisements and representations constitute deceptive and untruthful advertising and marketing. Nissan's scheme of false and misleading advertising and marketing has resulted in tens of thousands of consumers purchasing the Class vehicles, based upon the expectation that the Class vehicles have the qualities that are advertised and will function as represented.  Nissan's unfair and deceptive course of conduct is common to all purchasers of the Class vehicles and each putative Class member was injured by purchasing a defective product at an excessive price because it contained a defective design that did not become apparent until shortly after expiration of the warranty period, and the cost to correct the defect was, and is, substantial.

46.     As a result of Defendants' unfair, deceptive and/or fraudulent business practices, owners and/or lessees of class vehicles, including Plaintiffs, have suffered an ascertainable loss of money and/or property and/or loss in value.

47.     Plaintiffs bring this action to redress Defendants' violations of the
New Jersey Consumer Fraud Act and other consumer protection statutes, and seek
recovery for Defendants' negligent misrepresentations, breach of express warranty,
breach of implied warranty, and unjust enrichment.

**Plaintiff Tameka Nelson**

48.     Plaintiff, Tameka Nelson ("Nelson") purchased a pre-owned 2006
Nissan Maxima in or around August 2006, from Rancho Valley Chevrolet,
located in Pomona, California.  At the time of purchase, her vehicle's odometer
registered approximately 16,000 miles.

49.     Plaintiff Nelson purchased (and still owns) this vehicle for personal,
family, and/or household uses.  Plaintiff Nelson's vehicle bears Vehicle
Identification Number ("VIN"): 1N4BA41E46C809280.

50.     Beginning in 2010, Nelson began experiencing the same
transmission problems that have been experienced by all class members, as
further described below, including but not limited to, delayed shift patterns,
slippage, and harshness.

51.     On or about March 30, 2011, with only 77,551 miles, Nelson
experienced catastrophic transmission failure requiring her vehicle to be towed to
Nissan of San Bernardino for diagnosis.  Nelson was thereafter informed by
Nissan of San Bernardino that the transmission in her vehicle could not be

repaired and instead required the installation of a new transmission at an estimated cost of $3,400.  Plaintiff Nelson declined this costly repair.

52.     Plaintiff Nelson then brought her vehicle to a specialty transmission service center that performed the required transmission repairs.  In total, she incurred charges of approximately $90.00 as a diagnostic fee and $2,696.46 to repair the transmission as a result of the defective vehicle design.

53.     Plaintiff Nelson has suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the Transmission Problem, including, but not limited to, diminished value and out-of-pocket loss associated with a catastrophic transmission failure and attempted repairs in her class vehicle.

54.     At no time did Defendants or any of its agents, dealers or other representatives inform Plaintiff Nelson of Defendants' omissions and/or misrepresentations related to the Transmission Problem and/or defective vehicle design.

**Plaintiff Richard Creel**

55.     Plaintiff Richard Creel ("Creel") purchased a new 2005 Nissan Maxima in August 2005 from Bowser Pontiac, Inc., located in Pleasant Hills, Pennsylvania.

56.     Plaintiff Creel purchased (and still owns) this vehicle for personal, family, and/or household uses.  Plaintiff Creel's vehicle bears VIN: 1N4BA41E85C875104.

57.     Beginning in early 2008, Creel began experiencing the same transmission problems that have been experienced by all class members, as further described below, including but not limited to, erratic or delayed shift patterns, slippage, and harsh shifting.

58.     On or about April 10, 2008, Plaintiff Creel brought his vehicle (which had only 48,486 miles on it) to Bowser Nissan seeking repairs to fix the shifting problems.  Plaintiff Creel was told by Bowser Nissan that they could not duplicate the shifting problem, or find anything wrong with the transmission.

59.     Over the next year, the vehicle continued to exhibit shifting problems, and on January 7, 2009, with only 59,776 miles, Plaintiff Creel again took the vehicle to Bowser Nissan.  Bowser Nissan once again told Plaintiff Creel that they could not duplicate the shifting problem.

60.     Over the next two years, the shifting problems continued to worsen, and on March 3, 2011, with 86,943miles on the vehicle, Plaintiff Creel yet again complained to Bowser Nissan that the transmission was slipping, and Bowser Nissan again told Plaintiff Creel that nothing was wrong with the transmission.

61.     On March 18, 2011, Plaintiff Creel filed a complaint with Nissan North America.  Nissan North America would not process Plaintiff Creel's complaint unless he paid $89.00 (for which he would not be reimbursed) to take the vehicle to another Nissan dealership for a diagnostic test.  As a result, Plaintiff Creel took his vehicle to Pittsburgh East Nissan for diagnostic testing. Pittsburgh East Nissan confirmed that the transmission was not working properly and that it needed to be replaced with a re-furbished transmission at an estimated cost of $3,346.57.

62.     Armed with the estimates from Pittsburgh East Nissan, Plaintiff Creel followed-up on his complaint with Nissan North America.  Nissan North America eventually offered Plaintiff Creel $500 towards a replacement transmission or a free extended warranty if he chose to purchase a new Nissan vehicle.

63.     Plaintiff Creel rejected Nissan North America's offer, which would have left him with over $2,800 in out-of-pocket costs and instead took the vehicle to an independent transmission shop, which was able to repair the problem at a cost of $1,457.30.

64.     Plaintiff Creel incurred charges of approximately $1,546.30 as a result of the defective vehicle design.

65. Plaintiff Creel has suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the Transmission Problem, including, but not limited to, out-of-pocket loss associated with a diagnosis and repair of the transmission, and the inherently diminished value of the vehicle.

66. At no time did Defendants or any of its agents, dealers or other representatives inform Plaintiff Creel of Defendants' omissions and/or misrepresentations related to the Transmission Problem and/or defective vehicle design.

**Plaintiff Karim Abdullah**

67. Plaintiff, Karim Abdullah ("Abdullah") purchased a pre-owned 2004 Nissan Maxima, with approximately 37,000 miles, in or around January 2006, from Acura of Turnersville, located in Turnersville, New Jersey. At the time of purchase, Plaintiff Abdullah was a resident of Sicklerville, New Jersey. He subsequently moved to the State of Maryland in July 2011.

68. Plaintiff Abdullah purchased (and still owns) this vehicle for personal, family, and/or household uses. Plaintiff Abdullah's vehicle bears VIN: 1N4BA41E94C827660

69. Beginning in January 2009, with approximately 95,000 miles, Abdullah began experiencing the same transmission problems that have been

19

experienced by all class members, as further described below, including but not limited to, delayed shift patterns, slippage, and harshness.

70.     The transmission problems continued to worsen until finally, in or around January 2010, at approximately 110,000 miles, Plaintiff Abdullah's vehicle became non-drivable because of the Transmission Problem.  After parking the vehicle for an extended period of time, Plaintiff Abdullah ultimately had it towed to Linden Transmission, located in Sicklerville, New Jersey, in or around August 2011 for transmission service related to the Transmission Problem.

71.     Linden Transmission determined that Plaintiff Abdullah's vehicle required the transmission's valve body to be rebuilt with, *inter alia*, certain new components.

72.     Plaintiff Abdullah incurred charges of $1,200.00 to repair the transmission as a result of the defective vehicle design.

73.     Plaintiff Abdullah has suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the Transmission Problem, including, but not limited to, out-of-pocket loss associated with a catastrophic transmission failure, diminished value of the vehicle, and attempted repairs in his class vehicle.

74.     At no time did Defendants or any of its agents, dealers or other representatives inform Plaintiff Abdullah of Defendants' omissions and/or misrepresentations related to the Transmission Problem and/or defective vehicle design.

## TOLLING OF STATUTES OF LIMITATIONS

75.     Any applicable statute(s) of limitations has been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein.  Plaintiffs and members of the Classes could not have reasonably discovered the true, latent, and widespread defective nature of the Class vehicles and the 22A transmission until shortly before this class action litigation was commenced.

76.     Defendants were and remain under a continuing duty to disclose to Plaintiffs and members of the Classes the true character, quality and nature of the Class vehicles equipped with the 22A transmissions, that this defect is based on a poor design, and that it will inevitably require costly repairs to fix shortly after the warranty period expires (but well before the end of the useful life of the vehicle), and that this diminishes the resale value of the Class vehicles.  As a result of the active concealment by Defendants, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## CLASS ACTION ALLEGATIONS

77.     This action may properly be maintained as a class action pursuant to

Rule 23(a) and (b) of the Federal Rules of Civil Procedure.  Plaintiffs bring this

action as a class action on their own behalf, and on behalf of each of the

following classes pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and/or 23(b)(3).

> All persons or entities in California who are current or former
> owners or lessees of Nissan Maxima (MY 2004-06), Altima
> (MY 2005-06), and Quest (MY 2004-07) vehicles equipped
> with a 22A automatic transmission (the "California Sub-
> Class");

> All persons or entities in Pennsylvania who are current
> or former owners or lessees of Nissan Maxima (MY
> 2004-06), Altima (MY 2005-06), and Quest (MY
> 2004-07) vehicles equipped with a 22A automatic
> transmission (the "Pennsylvania Sub-Class");

> All persons or entities in New Jersey who are current
> or former owners or lessees of Nissan Maxima (MY
> 2004-06), Altima (MY 2005-06), and Quest (MY
> 2004-07) vehicles equipped with a 22A automatic
> transmission (the "New Jersey Sub-Class");

> All persons or entities in Maryland who are current or
> former owners or lessees of Nissan Maxima (MY
> 2004-06), Altima (MY 2005-06), and Quest (MY
> 2004-07) vehicles equipped with a 22A automatic
> transmission (the "Maryland Sub-Class").

78.     Together, the Sub-Classes shall be collectively referred to herein as

the "State Sub-Classes."  Excluded State Sub-Classes are Defendants, their

affiliates, employees, officers and directors, persons or entities that purchased the

vehicles for resale, and the Judge(s) assigned to this case.  Plaintiffs reserve the

right to modify the definitions of the Classes if discovery and/or further

investigation reveals that they should be expanded or otherwise modified.

79.    <u>Numerosity</u>:  Upon information and belief, each of the Classes is so

numerous that joinder of all members is impracticable. While the exact number

and identities of individual members of the Classes are unknown at this time,

such information being in the sole possession of Defendants and obtainable by

Plaintiffs only through the discovery process, Plaintiffs believe that tens of

thousands of Class vehicles have been sold and leased in the United States of

America, and thousands of Class vehicles have been sold or leased in each of the

states that are the subject of the State Sub-Classes.

80.    <u>Existence and Predominance of Common Questions of Fact and</u>

<u>Law</u>:  Common questions of law and fact exist as to all members of the Classes.

These questions predominate over the questions affecting individual Class

members.  These common legal and factual questions include, but are not limited

to:

     a.  whether the transmissions within the Class vehicles are predisposed to

        fail prematurely;

     b.  whether the transmissions in the Class vehicles contain a design

        defect;

c.  whether the defective vehicle design is common to all Class vehicles;

d.  whether the Transmission Problem is common to all Class vehicles;

e.  if so, whether the defective transmission design causes the Transmission Problem in Class vehicles;

f.  whether Defendants knowingly failed to disclose the existence and cause of the Transmission Problem in Class vehicles;

g.  whether Defendants' conduct violates the New Jersey Consumer Fraud Act and the other statutes asserted herein;

h.  whether, as a result of Defendants' omissions and/or misrepresentations of material facts related to the Transmission Problem and defective transmission design, Plaintiffs and members of the Classes have suffered ascertainable loss of moneys and/or property and/or value;

i.  whether Plaintiffs and Class members are entitled to monetary damages and/or other remedies, and if so the nature of any such relief; and

j.  whether Defendants have been unjustly enriched at the expense of Plaintiffs and Class members.

81.  <u>Typicality</u>:  Plaintiffs' claims are typical of the claims of the Classes since she purchased a Class vehicle with a Transmission Problem, defective

vehicle design, and defective transmission design, as did each member of the Classes. Furthermore, Plaintiffs and all members of the Classes sustained monetary and economic injuries including, but not limited to, ascertainable loss arising out of Defendants' wrongful conduct. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all absent Class members.

82.    Adequacy: Plaintiffs are adequate representatives because their interests do not conflict with the interests of the Classes that they seek to represent, they have retained counsel competent and highly experienced in complex class action litigation, and they intend to prosecute this action vigorously. The interests of the Classes will be fairly and adequately protected by Plaintiffs and their counsel.

83.    Superiority: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Classes. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the Classes individually to redress effectively the wrongs done to them. Even if the members of the Classes could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments.

Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Classes can be readily identified and notified based on, *inter alia*, Defendants' vehicle identification numbers, warranty claims and registration records, and database of complaints.

84.     Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## VIOLATIONS ALLEGED

### COUNT I
### VIOLATION OF THE NJCFA
### (On Behalf of the New Jersey Class)

85.     Plaintiffs and the Classes incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

86.   The New Jersey Consumer Fraud Act ("NJCFA") protects consumers against "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon

such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise…" N.J.S.A. 56:8-2.

87.   Plaintiff Abdullah, the other named Plaintiffs, and members of the Class are consumers who purchased and/or leased Class vehicles for personal, family or household use.

88.   Defendants engaged in unlawful conduct, made affirmative misrepresentations, or otherwise violated the NJCFA.  Specifically, Defendants were aware that the Class vehicles suffered from a common design defect resulting in transmission problems, but failed to disclose this to Plaintiffs and Class members.  Defendants also marketed these vehicles as being of superior quality when the class vehicles contained a known defect.  These affirmative misrepresentations were material to the vehicle purchases, and were false statements of fact.

89.   Defendants also engaged in unlawful conduct in violation of the NJCFA by making knowing and intentional omissions.  Defendants knowingly failed to disclose the design defect in the Class vehicles in order to secure the sale of these vehicles, and to offer them at a premium price.

90.   Defendants did not fully and truthfully disclose to its customers the true nature of the inherent design defect with the transmission, which was not readily discoverable until years later, often after the warranty has expired.  As a

result, Plaintiffs and the other Class Members were fraudulently induced to lease and/or purchase the Class vehicles with the said design defects and all of the resultant problems.  These facts that Defendants concealed were solely within their possession.

91.   Defendants intended that Plaintiffs and all Class Members rely on the acts of concealment and omissions, so that they would purchase the class vehicles.

92.   Defendants' conduct caused Plaintiffs and Class members to suffer an ascertainable loss.  In addition to direct monetary losses, Plaintiffs and Class members have suffered an ascertainable loss by receiving less than what was promised.

93.   A causal relationship exists between Defendants' unlawful conduct and the ascertainable losses suffered by Plaintiffs and the Class.  Had the defective vehicle design in the Class vehicles been disclosed, consumers would not have purchased them or would have paid less for the Class vehicles had they decided to purchase them.

## COUNT II
## VIOLATION OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT, CALIFORNIA CIVIL CODE § 1750, *ET SEQ.*
### (On Behalf of the California Class)

94.     Plaintiffs incorporate by reference the allegations of all foregoing Paragraphs as if such had been set forth in full herein.

95.     California's Consumer Legal Remedies Act ("CLRA") prohibits unfair methods of competition and unfair or "deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." CAL. CIV. CODE § 1770.

96.     Defendant engaged in unfair and deceptive acts in violation of the CLRA by the practices described above, and by knowingly and intentionally concealing from Plaintiffs and Class members that the Class vehicles suffer from a design defect (and the costs, risks, and diminished value of the vehicles as a result of this problem).   These acts and practices violate, at a minimum, the following sections of the CLRA:

> (a)(2) Misrepresenting the source, sponsorship, approval or certification of goods or services;

> (a)(5) Representing that goods or services have sponsorships, characteristics, uses, benefits or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation or connection which he or she does not have;

(a)(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

(a)(9) Advertising goods and services with the intent not to sell them as advertised; and

(a)(19) Inserting an unconscionable provision into a contract.

97.    Defendant's unfair and deceptive acts extend to consumer transactions, and caused injuries to Plaintiffs and Class members.

98.    Plaintiffs hereby sees injunctive relief under the CLRA.

**COUNT III**
**VIOLATION OF THE CALIFORNIA BUSINESS**
**AND PROFESSIONS CODE § 17200**
**(On Behalf of the California Class)**

99.    Plaintiffs incorporate by reference the allegations of all foregoing Paragraphs as if such had been set forth in full herein.

100.    The California Unfair Competition Law ("UCL") prohibits unfair competition and unfair, unlawful or fraudulent business practices.

101.    Defendant has engaged in unfair competition and unfair, unlawful or fraudulent business practices by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiffs and Class members that the Class vehicles suffer from a design defect (and the costs, risks, and diminished value of the vehicles as a result of this problem).  Defendant should have disclosed this information because they were in a superior position to

30

know the true facts related to this design defect, and Plaintiffs and Class members could not reasonably be expected to learn or discover the true facts related to this defect.

102.   These acts and practices have deceived Plaintiffs and are likely to deceive the public.  In failing to disclose the design defect and suppressing other material facts from Plaintiffs and Class members, Defendant breached their duties to disclose these facts, violated the UCL, and caused injuries to Plaintiffs and Class members.  The omissions and acts of concealment by Defendant pertained to information that was material to Plaintiffs and Class members, as it would have been to all reasonable consumers.

103.   The injuries suffered by Plaintiffs and Class members are greatly outweighed by any potential countervailing benefit to consumers or to competition.  Nor are they injuries that Plaintiffs and Class members should have reasonably avoided.

104.   Defendants' acts and practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710 and 1750 *et seq.*, and California Commercial Code § 2313.

105.   Plaintiffs seek to enjoin further unlawful, unfair and/or fraudulent acts or practices by Defendant, to obtain restitutionary disgorgement of all

monies and revenues generated as a result of such practices, and all other relief

allowed under CAL. BUS. & PROF. CODE § 17200.

## COUNT IV
### VIOLATION OF THE CALIFORNIA BUSINESS
### AND PROFESSIONS CODE § 17500
### (On Behalf of the California Class)

106.   Plaintiffs incorporate by reference the allegations of all foregoing

Paragraphs as if such had been set forth in full herein.

107.   This claim arises under California's False Advertising Law ("FAL"),

which prohibits untrue or misleading advertising in the sale of personal property.

108.   At all times relevant hereto, Nissan was a "person" and a

"corporation", within the definition of Bus. & Prof. Code § 17506.

109.   The FAL provides that "[i]t is unlawful for any person, firm,

corporation or association with intent ... to dispose of ... personal property ... to

induce the public to enter into any obligation relating thereto, to make or

disseminate or cause to be made or disseminated before the public in this state, ...

any statement ... which is untrue or misleading, and which is known, or which by

the exercise of reasonable care should be known, to be untrue or misleading..."

Bus. & Prof. Code § 17500.

110.   On the advertisements, brochures, and marketing materials described

herein, Defendant represented that the Class vehicles were of high quality and

free from defect.

111.   Defendant did not disclose, conspicuously or otherwise, on any of these materials that such representations were false, untrue and/or misleading.

112.   Defendants' acts of untrue and misleading advertising present a continuing threat to members of the public because such advertisements induce consumers to purchase the Class vehicles.  Defendant's actions, as complained of in this Complaint, constitute unfair trade practices that are likely to and do deceive consumers, including Plaintiff, in violation of Section 17200 of the FAL.

113.   As a result of the violations of California law described above, Nissan has been, and will be, unjustly enriched at the expense of Plaintiffs and the members of the Classes.  Specifically, Defendant has been unjustly enriched by receipt of hundreds of thousands, if not millions, of dollars in monies received from customers who purchased the Class Vehicles which were advertised and/or otherwise marketed in this District, this State, and the United States, and which are promoted and sold through advertising and marketing materials which materially misrepresent the quality and functions of the product.

114.   Pursuant to Bus. & Prof. Code § 17535, Plaintiffs request that this Court make such orders or judgments as may be necessary to prevent the use or employment by Nissan of untrue and misleading advertisements, or which may be necessary to restore to Plaintiffs and the members of the Classes any money

which may have been acquired by Nissan by means of such untrue and misleading advertisements.

## COUNT V
## BREACH OF EXPRESS WARRANTY
### (On Behalf of each of the State Sub-Classes)

115. Plaintiffs and the Classes repeat and incorporate herein by reference each and every paragraph of this complaint as though set forth in full in this cause of action.

116. Defendants expressly warranted that the Class vehicles were of high quality and, at a minimum, would actually function properly.

117. Defendants' breached this warranty by selling to Plaintiffs and Class members the Class vehicles, which contain the known Transmission Problem, since they are not of high quality, and inevitably fail prematurely (and well before the expiration of their useful life).

118. Defendants' breach of this warranty caused damages to Plaintiffs and Class members.

119. Defendants' attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Defendants' warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers about the defect.

120.   The time and mileage limitations contained in Defendants' warranty period were also unconscionable and inadequate to protect the Plaintiffs and members of the Classes.  Among other things, the Plaintiffs and members of the Classes had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants.  A gross disparity in bargaining power existed between Nissan and Class members, and Nissan knew or should have known that the Class vehicles were defective at the time of sale and would fail well before their useful lives.

121.   Defendants concealed material information (that the transmissions in the Class Vehicles would prematurely fail) from Plaintiff and Class members. Defendants acted intentionally with the purpose of maximizing profit.

122.   Plaintiffs and Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.   In addition, Defendants were put on notice of the defect because they had actual knowledge of the existence of this design defect at all relevant times.

## COUNT VI
## BREACH OF THE IMPLIED
## WARRANTY OF MERCHANTABILITY
### (On Behalf of each of the State Sub-Classes)

123.   Plaintiffs and the Classes repeat and incorporate herein by reference each and every paragraph of this complaint as though set forth in full in this

cause of action.

124.   Defendants impliedly warranted that the Class vehicles were of a merchantable quality.

125.   Defendants breached the implied warranty of merchantability, as the Class vehicles were not of a merchantable quality due to the Transmission Problem.

126.   As a direct and proximate result of the breach of said warranties, Plaintiffs and Class members were injured, and are entitled to damages.

127.   Defendant's attempt to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Defendants' warranty limitation is unenforceable here because they knowingly sold a defective product without informing consumers about the defect.

128.   The time and mileage limitations contained in Defendants' warranty period are also unconscionable and inadequate to protect Plaintiffs and members of the Classes.  Among other things, Plaintiffs and members of the Classes had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants.  A gross disparity in bargaining power existed between Nissan and Class members, and Nissan knew or should have known that the Class vehicles were defective at the time of sale and would fail well before

their useful lives.

129.   Plaintiffs and Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

## COUNT VII
## UNJUST ENRICHMENT
### (On Behalf of each of the State Sub-Classes)

130.   Plaintiffs and the Classes repeat and incorporate herein by reference each and every paragraph of this complaint as though set forth in full in this cause of action.

131.   This claim is plead in the alternative to the breach of warranty claims.

132.   Plaintiffs and Class members conferred a tangible economic benefit upon Defendant by purchasing the Class Vehicles.  Plaintiffs and Class members would have expected remuneration from the Defendant at the time this benefit was conferred had these buyers and lessees known of the Transmission Problem within the Class vehicles would result in premature failure.

133.   Failing to require Defendants to provide remuneration under these circumstances would result in them being unjustly enriched at the expense of Plaintiffs and the Class.  This unjust enrichment was beyond any of Defendants' contractual rights.

134.   Defendant's retention (without an offsetting return payment) of the

benefit conferred upon them by Plaintiffs and members of the Classes would be unjust and inequitable.

### COUNT VIII
### VIOLATION OF THE PENNSYLVANIA
### UNFAIR TRADE PRACTICES ACT
### (On Behalf of the Pennsylvania State Sub-Class)

135.   Plaintiff Creel incorporates the allegations in the preceding paragraphs. This Count is brought on behalf of the **Pennsylvania Sub-Class.**

136.   The conduct alleged above constitutes unfair methods of competition or unfair or deceptive acts or practices in violation of Section 201-2(4)(v),(vii), (xiv) and (xxi) of the UTPCPL, 73 Pa.C.S.A. §§ 201-1, *et seq*.

137.   The UTPCPL applies to the claims of Plaintiff Creel and the other members of the Pennsylvania Sub-Class because the conduct which constitutes violations of the UTPCPL by the Defendant occurred in substantial part within the Commonwealth of Pennsylvania.

138.   Plaintiff Creel and the other members of the Pennsylvania Sub-Class are consumers who purchased Class Vehicles primarily for personal, family or household purposes within the meaning of 73 Pa.C.S.A. § 201-9.2.

139.   Defendants used and employed unfair methods of competition and/or unfair or deceptive acts or practices within the meaning of 73 Pa.C.S.A. §§ 201-2 and 201-3.

140.   Defendants' concealments, omissions, deceptions and conduct were likely to deceive and likely to cause misunderstanding and/or in fact caused Plaintiff Creel and the other members of the Pennsylvania Sub-Class to be deceived.

141.   Defendants intended that Plaintiff Creel and the other members of the Pennsylvania Sub-Class would rely on its misrepresentations, concealment, warranties, deceptions and/or omissions.

142.   Plaintiff Creel and the other members of the Pennsylvania Sub-Class have been damaged as a proximate result of Defendants' violations of the UTPCPL and have suffered actual, ascertainable losses.

143.   As a direct and proximate result of Defendants' violations of the UTPCPL as set forth above, Plaintiff Creel and the other members of the Pennsylvania Sub-Class have suffered an ascertainable loss of money and are therefore entitled to relief, including damages, plus triple damages, costs and attorney's fees under Section 201-9.2 of the UTPCPL.

144.   To the extent that justifiable reliance is required to be plead, Plaintiffs have justifiably relied on the Defendants' conduct and omissions.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and members of the Classes, respectfully request that this Court:

A.    determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

B.    appoint Plaintiffs as representatives of the Classes and their counsel as Class counsel;

C.    award all actual, general, special, incidental, statutory, punitive, and consequential damages to which Plaintiffs and Class members are entitled;

D.    award pre-judgment and post-judgment interest on such monetary relief;

E.    grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendants to repair, recall, and/or replace the Class vehicles or, at a minimum, to provide Plaintiffs and Class members with appropriate curative notice regarding the existence and cause of the design defect;

F.    award reasonable attorney's fees and costs; and

G.    grant such further relief that this Court deems appropriate.

DATED:  September 30, 2011

By:    */s/ Joseph G. Sauder*
      Joseph G. Sauder
      Matthew D. Schelkopf
      Benjamin F. Johns
      CHIMICLES & TIKELLIS LLP
      One Haverford Centre
      361 West Lancaster Avenue
      Haverford, PA 19041
      Telephone: (610) 642-8500
      Facsimile: (610) 649-3633
      JGS@chimicles.com
      MDS@chimicles.com
      BFJ@chimicles.com


      Michael A. Caddell (*pro hac vice* to be filed)
      Cynthia B. Chapman (*pro hac vice* to be filed)
      Cory S. Fein (*pro hac vice* to be filed)
      CADDELL & CHAPMAN, P.C.
      1331 Lamar, Suite 1070
      Houston, TX 77010
      Telephone:  713.751.0400
      Facsimile:  713.751.0906
      mac@caddellchapman.com
      cbc@caddellchapman.com
      csf@caddellchapman.com


      ***Attorneys for Plaintiffs and the Proposed Classes***